**POMERANTZ LLP**
Jordan L. Lurie, State Bar No. 130013
jllurie@pomlaw.com
Ari Y. Basser, State Bar No. 272618
abasser@pomlaw.com
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Telephone: (310) 432-8492

*Attorneys for Plaintiff and the Class*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

CORY HAZDOVAC, individually and on behalf of all others similarly situated,

Plaintiff,

vs.

MERCEDES BENZ USA, LLC, and DOES MBUSA 1 through 10, inclusive,

Defendants.

Case No. 20-cv-00377-RS

**CLASS ACTION**

**THIRD AMENDED COMPLAINT FOR:**

**(1) VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE, SECTION 17200, *et seq.***

**(2) VIOLATION OF THE CONSUMERS LEGAL REMEDIES ACT, CAL. CIV. CODE SECTION 1770, *et seq.***

**FILED PURSUANT TO ORDER ON STATUS REPORT (ECF NO. 113)**

Plaintiff Cory Hazdovac ("Plaintiff"), individually and on behalf of all other persons similarly situated, brings this action against Defendant Mercedes Benz USA, LLC ("Defendant" or "MBUSA" or "Mercedes"), and upon information and belief, except as to her own actions, the investigation of her counsel, and facts that are a matter of public record, alleges as follows:[1]

## INTRODUCTION

1. This class action focuses on MBUSA's failure to identify fourteen (14) vehicle parts ("the Subject Parts") in Mercedes vehicles, including Mercedes C300 vehicles, that should properly be classified as "high-cost" or "high-priced" emissions warranty parts" or ("HPP"), under the requirements of the California Emissions Warranty ("Emissions Warranty") (California Code of Regulations ("CCR") Title 13, § § 2035, *et seq*.) and covered under the Emissions Warranty for 7 years and/or 70,000 miles, whichever comes first.

2. By not identifying the Subject Parts that should be included as "high-priced," MBUSA has attempted to wrongfully limit the warranty coverage to MBUSA's standard 4-year and 50,000-mile warranty and thereby minimize MBUSA's warranty costs for the Subject Parts. MBUSA has relied on self-reporting and a lack of sufficient governmental resources to avoid consequences for its wrongful conduct.

3. By this action, Plaintiff seeks, primarily, declaratory relief that the Subject Parts in the Class Vehicles are covered parts under the California Emissions Warranty and that MBUSA's failure to identify the Subject Parts as HPP warranted parts in the Class Vehicles violates the unlawful and/or unfair prongs of the Unfair Competition Law, Cal. Bus. & Prof. Code Section 17200, *et seq*. and/or Section 1770 of the California Consumers Legal Remedies Act, Cal. Civ. Code Section 1750, *et seq*. (the "CLRA"); and relief requiring MBUSA to identify the Subject Parts as covered parts for the Class Vehicles and requiring MBUSA to notify Class members and MBUSA dealerships that the Subject Parts in Class Vehicles are eligible for coverage under the California Emissions Warranty.

[1] Plaintiff files this Third Amended Complaint ("TAC") pursuant to ECF 113. Plaintiff reserves the right to further amend this TAC as necessary.

4. By this action, Plaintiff also seeks reimbursement for out of pocket costs paid for the diagnosis, repair and/or replacement of the Subject Parts in Class Vehicles that properly should have been covered by MBUSA under the 7-years and /or 70,000-mile Emissions Warranty, but were not covered.

**JURISDICTION AND VENUE**

5. This Court has removal jurisdiction over this action pursuant to 28 U.S.C. § 1441 and § 1332(d)(2)(A). Members of the Class are citizens of a state different from that of Defendant MBUSA and aggregating the claims of individual members of the Class, the total matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs. Further, 28 U.S.C. § 1332(d)(5) does not apply because (i) MBUSA is not a state, state official, or other governmental entity against whom the Court may be foreclosed from ordering relief, and (ii) the number of members of the Class in the aggregate exceeds 100.

6. This Court has personal jurisdiction over Defendant because Defendant has sufficient minimum contacts with California, having intentionally availed itself of the California market so as to render the exercise of jurisdiction over it by this District Court consistent with traditional notions of fair play and substantial justice. Further, by removing this action to this Court, Defendant concedes personal jurisdiction.

7. Venue is proper in this Court pursuant to 28 U.S.C. §1391 because Defendant conducts business within the State of California and a substantial part of the events giving rise to the claims alleged herein occurred in this District.

**PARTIES**

8. Plaintiff Cory Hazdovac is, and at all times relevant hereto has been, a resident and citizen of the State of California, County of Kern.

9. MBUSA was and is, upon information and belief, a Delaware limited liability company doing business in California.

10. The true names and capacities of Defendants sued in this Complaint as Does 1 through 10, inclusive, are currently unknown to Plaintiff, and therefore Plaintiff sues such Defendants by such fictitious names.

11. Plaintiff is informed and believes, and thereon alleges, that DOES 1 through 10 were the partners, agents, owners, shareholders, managers, or employees of MBUSA at all relevant times.

12. Plaintiff is informed and believes, and on that basis alleges that each of the fictitiously named Defendants was in some manner legally responsible for the actionable and unlawful actions, policies and practices as alleged herein. Plaintiff will amend this Complaint to set forth the true names and capacities of said Defendants, along with the appropriate charging allegations, when the same have been ascertained, as may be necessary. Each reference in this Complaint to "MBUSA" or "Defendant" is also a reference to all Defendants sued as Does 1 through 10.

13. Plaintiff reserves the right to expand, limit, modify, or amend these allegations at any time, based upon, inter alia, changing circumstances and/or new facts obtained during discovery.

## BACKGROUND

### Regulatory Framework

14. In order to understand the effect of Defendant's wrongful conduct, it is important to identify the regulatory provisions at issue with respect to the Subject Parts.

15. California Health & Safety Code § 43200 empowered the California Air Resources Board ("CARB") to adopt Regulations governing vehicle emissions. Section 43205 states, in relevant part, that:

> (a) Commencing with the 1990 model-year, the manufacturer of each light-duty and medium-duty motor vehicle and motor vehicle engine shall warrant to the ultimate purchaser and each subsequent purchaser that the motor vehicle or motor vehicle engine meets all of the following requirements:
>
> > (1) Is designed, built, and equipped so as to conform with the applicable emissions standards specified in this part.

> (2) Is free from defects in materials and workmanship which cause the motor vehicle or motor vehicle engine to fail to conform with applicable requirements specified in this part for three years or 50,000 miles, whichever first occurs.
>
> (3) Will, for a period of three years or 50,000 miles, whichever first occurs, pass a test established under Section 44012 [i.e., Smog Test] . . .
>
> (4) Is free from defects in materials and workmanship in emission related parts . . .

16. Health and Safety Code § 39027.3 defines an "emissions-related motor vehicle part" as any automotive part "that may affect emissions from a motor vehicle, including replacement parts, consolidated parts, rebuilt parts, remanufactured parts, add-on parts, modified parts, and specialty parts."

17. Title 13 (Motor Vehicles), Division 3 (Air Resources Board), Chapter 1, Article 6, Section 2035 et seq. sets forth the statutory emissions warranty i.e., the California Emissions Warranty, adopted by CARB pursuant to Health & Safety Code § 43205.

18. Section 2035(c)(2)(3)(b) states, in relevant part, that a "Warranted Part" under the California Emissions Warranty is "any part installed on a motor vehicle or motor vehicle engine by the vehicle or engine manufacturer or installed in a warranty repair which affects any regulated emission from a motor vehicle or engine which is subject to California emission standards." (Italics added). [2]

19. Chapter 1, Article 1, Section 1900(b)(3) also defines an "emissions-related part" as "any automotive part which *affects any regulated emission* from a motor vehicle which is subject to California or federal emission standards." Italics added.

---

[2] Section 2035 was recently amended to add provisions regarding trailers and diesel powered heavy duty vehicles. This changed the subsection numbering on Section 2035, but not the content. Plaintiff's allegations refer to the Section 2035 subsection numbers that were in place prior to the amendment, when Defendant's obligations arose and when the vehicles at issue in this action were certified for sale in California.

20. A "regulated emission" under these Regulations refers to greenhouse gas emissions, including carbon dioxide emissions. 13 CCR §§ 1950, *et seq*.

21. A vehicle or engine part whose defect "affects regulated emissions" is referred to as an "emissions-related part." Specifically, Section 1900(b)(3) describes an "emissions-related part" under the California Emissions Warranty as "any automotive part, which affects regulated emission from a motor vehicle which is subject to California or federal emissions standards. This includes, at a minimum, those parts identified in the "Emissions-Related Parts List," adopted by the State Board [CARB] on November 4, 1977, as last amended June 1, 1990." (Italics added).

22. Similarly, Section 2601(i) also states that an "'Emissions-related part' means any vehicle part which affects any regulated emissions from a vehicle that is subject to California or federal emissions standards and includes, but is not limited to, those parts specified in the 'Emissions-Related Parts List,' adopted by the State Board on November 4, 1977, as last amended June 1, 1990."

23. Therefore, any part that "affects regulated emissions" and/or is identified on the "Emissions-Related Parts List," adopted by the State Board on November 4, 1977, as last amended June 1, 1990 (the "June Emissions-Related Parts List") is an emissions-related part required to be covered under the California Emissions Warranty.

24. In addition, as defined by Section 2037(b), a "warranted part" under the California Emissions Warranty also includes a vehicle or engine part that can, or is required to, illuminate the vehicle's OBDII Malfunction Indicator Light (MIL) in the event of a malfunction, even if the primary function of the component is not emission control. (This definition is also confirmed in the CARB Declaration discussed below.)

25. In other words, a defect in any vehicle or engine part, even a part whose primary function is not emission control or is not identified by name on the June Emissions-Related Parts List, will also be deemed a "warranted part" and covered under the California Emissions Warranty when a defect in that part causes the vehicle's MIL to illuminate. This is because such a defect prevents the underlying warranted part in the vehicle or engine from performing as

required in the vehicle's application for certification, as set forth in Section 2037(b)(2). Indeed, Section IX of the June 1990 Emissions-Related Parts List discussed below specially includes coverage for "Miscellaneous Items" used in various vehicle systems and whose primary function is not emission control.

26. Section 2037(b) provides, in relevant part, that the manufacturer of each motor vehicle or motor vehicle engine shall warrant to the ultimate purchaser and each subsequent purchaser that the vehicle or engine is:

> (1) Designed, built, and equipped so as to conform with all applicable regulations adopted by the Air Resources Board pursuant to its authority in chapters 1 and 2, part 5, division 26 of the Health and Safety Code; and
>
> (2) Free from defects in materials and workmanship which cause the failure of a warranted part to be identical in all material respects to the part as described in the vehicle or engine manufacturer's application for certification, including any defect in materials or workmanship which would cause the vehicle's on-board diagnostic malfunction indicator light to illuminate, for a period of three years or 50,000 miles, whichever first occurs.

27. Section 1968.2 further confirms that illumination of the MIL correlates with a defect in an emissions-related part. Section 1968.2 specifically mandates that the MIL should not illuminate unless the part has an emissions-related defect.

28. As further described below regarding the OBDII System, all vehicles must be equipped with an OBDII onboard diagnostic system. The purpose of the OBDII system is specifically to monitor emissions-related components, and all vehicle manufacturers are required to provide to CARB "OBDII Summaries" or "OBDII Tables" that identify all fault codes that are emissions-related. When a defect triggers a fault code monitored by the OBDII system and the MIL illuminates, that is confirmation that the defect is "emissions-related." Therefore, when a defect that triggers a fault code monitored by the OBDII system causes the

MIL to illuminate, the repair must be performed under the California Emissions Warranty. The OBDII systems in the Class Vehicles detected a fault code that caused the MIL to illuminate and that correlated with the Subject Parts, thereby confirming that the Subject Parts "affects regulated emissions" and are "emissions related."

29. In addition to the foregoing, Section 2038(b) requires that manufacturers warrant that the vehicle or engine will pass a smog test. As Section 2038(b) states, the manufacturer must warrant that:

> (1) Is designed, built, and equipped so as to conform with all applicable regulations adopted by the Air Resources Board pursuant to its authority in chapters 1 and 2, part 5, division 26 of the Health and Safety Code; and
>
> (2) Will, for a period of three years or 50,000 miles, whichever first occurs, pass an inspection established under section 44012 of the Health and Safety Code [i.e., a smog test]. 35.

30. The smog check provision pursuant to Section 2038(b)(2) requires MBUSA to warrant that Plaintiff's vehicle *will* pass a smog check, regardless of the type of defect. An actual smog test failure is not required for the warranty to be in effect. A vehicle with a defect that triggers an MIL will not pass a smog test.

31. Section 2035(c)(1) defines a "Warrantable Condition" under the California Emissions Warranty as "any condition of a vehicle or engine which triggers the responsibility of the manufacturer to take corrective action pursuant to sections 2036, 2037 or 2038," and confirms that the California Emissions Warranty covers design defects and defects in materials and workmanship which cause the failure of a warranted part.

**"High-priced Parts"**

32. Section 2037(b)(3) and Section 2037(b)(3)(c) address "High-Priced" Warranted Parts, *i.e.*, emissions-related parts that are also "high-priced," as defined by the Regulations. For "high-priced" warranted parts, the warranty period is extended from 3 years or 50,000 miles to 7 years or 70,000 miles, whichever comes first.

33. A "high-priced" warranted part is defined as a warranted part whose individual replacement cost at the time of certification exceeds the "cost limit" set forth by the Regulations. Section 2037(c)(1) states, in relevant part, that in calculating whether an individual replacement cost at the time of certification exceeds the cost limit, "the replacement cost shall be the retail cost to a vehicle owner and include the cost of the part, labor, and standard diagnosis." Similarly, Section 2037(c)(2) states that "the replacement cost shall be the retail cost to a vehicle owner and include the cost of the part, labor, and standard diagnosis." The costs shall be those of the highest-cost metropolitan area of California.

34. The cost limit for determining a particular part's individual replacement cost at the time of certification shall be calculated using the following equation:

Cost limitn = $300 x (CPIn-2 / 118.3) where:

Cost limitn is the cost limit for the applicable model year of the vehicle rounded to the nearest ten dollars. n is the model year of the new vehicles.

n-2 is the calendar year two years prior to the model year of the new vehicles.

CPI is the annual average nationwide urban consumer price index published by the United States Bureau of Labor Statistics.

35. If, upon conducting this calculation, the price of replacement exceeds the cost limit, the part is a "high-priced" warranted part, and the manufacturer is statutorily required to extend warranty coverage for the part's repair or replacement to 7 years or 70,000 miles.

36. Section 2037(f) provides that each manufacturer shall furnish with each new vehicle or engine a list of the "high-priced" warranted parts for that vehicle. Each manufacturer also is required to submit to CARB the documentation used to identify the "high-priced" warranted parts. The documentation shall include the estimated retail parts costs, labor rates in dollars per hour, and the labor hours necessary to diagnose and replace the parts.

37. With respect to both "emission-related parts" and "high-priced" parts, Section 2037(d) of the California Emissions Warranty provides, in relevant part, that "the repair or replacement of any warranted part shall be performed at no charge to the vehicle or engine owner at a warranty station" and that "the vehicle or engine owner shall not be charged for

diagnostic labor which leads to the determination that a warranted part is defective, provided that such diagnostic work is performed at a warranty station."

**The Purpose of the California Emissions Warranty is to Limit Emissions and Protect the Environment, and the Requested Relief Achieves that Purpose**

38. The purpose and goal of the California Emissions Warranty is to protect the environment and the general public, which is also Plaintiff's purpose with respect to the Subject Parts. The Emissions Warranty was enacted by the State of California to restrict harmful greenhouse gas emissions from gasoline and hybrid gasoline engines. The fundamental purpose of the emissions requirements is to reduce emissions, limit fuel consumption and increase fuel efficiency, by forcing manufacturers to repair and/or replace failed emissions-related vehicle components under warranty, thereby decreasing greenhouse gas emissions, including carbon dioxide emissions, to the general public. The California Legislature, through the enactment of the California Emissions Warranty, has clearly indicated that the goal of limiting regulated emissions is for the benefit of the public in general and not just purchasers of specific automobiles.

39. Indeed, motor vehicle use is the single greatest source of U.S. air pollution and is the cause of more air pollution than any other human activity. (Cars, Fuels, and Clean Air: A Review of Title II of the Clean Air Act Amendments of 1990 (1991) 21 Envtl. L. 1947, 1949). Many of these pollutants consist of hydrocarbons and nitrous oxides which react to form photochemical oxidants in the atmosphere. The most notorious of these photochemical oxidants is ozone – the primary component of urban smog. (California Air Resources Bd., Staff Report: Proposed Regulations for Low-Emission Vehicles and Clean Fuels (Aug. 13, 1990) at p. 3). Cars also produce nearly two-thirds of all carbon dioxide emissions. Carbon dioxide content in the atmosphere is closely linked to global temperature because the temperature of the Earth is primarily determined by the balance between its absorption of energy from the Sun, and the reflection of a portion of this energy back into space. Carbon dioxide – a greenhouse gas – traps the energy and heat which would have otherwise escaped back into space, and re-emits it, causing the warming of our atmosphere. This process is known as the "greenhouse effect."

40. Therefore, the State of California highly regulates emissions from gasoline and hybrid gasoline engines, specifically greenhouse gas emissions. In September 1990, pursuant to its broad authority to regulate and reduce environmentally harmful vehicle emissions under Health and Safety Code §§ 43013(a) and 43205, CARB submitted, and the Legislature adopted, California Code of Regulation §§ 2035, et seq., which requires all manufacturers to provide a statutorily compliant emissions warranty to all vehicles distributed and registered in California.

41. In September 2004, CARB approved the "Pavley" Greenhouse Gas Regulations to control greenhouse gas emissions from new LEV II vehicles beginning with the 2009 model year. These Greenhouse Gas Regulations added four greenhouse gas air contaminants to the vehicular criteria and toxic air contaminant emissions that California was already regulating - carbon dioxide (CO2), methane (CH4), nitrous oxide (N2O), and hydrofluorocarbons (air conditioner refrigerants).

42. Greenhouse gas emissions also contribute to climate change, which can indirectly impact health through extreme weather events, increased heat-related illness, shifts in disease vector distribution, and threats to food and water supply.

43. The goal of CARB's emissions regulations is to directly address these health risks and provide tangible public health benefits by meeting the State's health based ambient air quality standards across California and minimizing the negative health effects of vehicle emissions in California and in the State's communities.

44. Environmental harm suffered by Plaintiff and the public with respect to the Subject Parts is directly tethered to the emissions-related issues alleged herein. These issues resulted in additional, harmful emissions being released into the environment by the Subject Parts in the Class Vehicles that adversely affect the environment – which is precisely the harm that the California Emissions Warranty was enacted to avoid.

**CARB Declaration**

45. CARB has provided a Declaration from Allen Lyons, (who was the Chief of the Emissions Certification and Compliance Division of CARB when the Declaration was provided) regarding the California Emissions Warranty (the "CARB Declaration") "for the sole purpose of

educating the Courts about CARB's interpretation and implementation of California's warranty requirements." The CARB Declaration sets forth CARB's interpretation of certain of the foregoing CCR provisions, including how to define a "warranted part" for purposes of the California Emissions Warranty and how to properly determine whether an emissions part is also a "high-priced emissions part" entitled to extended warranty coverage for 7 years and 70,000 miles.

46. The CARB Declaration states, in relevant part, that "warranted parts" under the California Emissions Warranty "include any components that can or are required to illuminate the OBD Malfunction Indicator Light (MIL) in the event of a malfunction, *even if the primary function of the component is not emission control*, within the warranty period. (Cal. Code Regs., tit. 13, § 2037, subd. (b)(2).) Italics added. The MIL is a light located on the driver's side instrument panel that, when illuminated, is amber in color and displays "Check Engine/Powertrain," "Service Engine/Powertrain Soon," or the International Standards Organization (ISO) engine symbol; the MIL illuminates to notify the driver of detected malfunctions of OBD-monitored emissions systems on the vehicle. (Cal. Code Regs., tit. 13, § 1968.2, subds. (a), (d)(2.1.1) & (2.2.).)"

47. The CARB Declaration further provides: "One specific type of warranted part is an "emissions-related part." (Cal. Code Regs., tit. 13, § 2035, subd. (c)(2)(B).) An 'emissions related part' is defined in California Code of Regulations, title 13, section 1900, subdivision (b)(3), as any automotive part, which affects any regulated emissions from a motor vehicle which is subject to California or federal emission standards. This includes, at a minimum, those parts specified in the "Emissions-Related Parts List," adopted by the State Board on November 4, 1977, as last amended June 1, 1990."

48. Thus, the CARB Declaration clarifies the standard for determining whether a warranted part is emissions related. "Emissions-related parts" under the California Emissions Warranty are any vehicle part whose failure affects regulated emissions and/or whose failure can, or is required, to illuminate the MIL, and that such parts are not limited to the emissions control system only.

49. The CARB Declaration further provides that, "When calculating the cost of labor portion of the replacement cost equation, in order to determine if a part is a "high-priced" warranted part for the purposes of California Code of Regulations, title 13, section 2037, subdivision (c), manufacturers first calculate the amount of time it would take to diagnose and repair or replace the part (the labor hours). A dollar amount is then attributed to the number of labor hours to come up with a cost of labor for each part. In doing this, manufacturers should use the labor hours and associated costs that would be charged to consumers to perform any required diagnosis and repairs to or replacement of the part, not the labor hours that manufacturers' service dealerships are allowed to charge manufacturers."

50. Accordingly, Defendant has an obligation under the California Emissions Warranty to identify all emissions-related vehicle components for which there should be warranty coverage. As a custom and practice, MBUSA has interpreted this obligation too narrowly, resulting in MBUSA wrongfully failing to identify the Subject Parts as emissions-related vehicle components under the California Emissions Warranty.

**The OBDII Fault Code System**

51. As referred to above, the Class Vehicles are equipped with an OBDII onboard diagnostic system. According to CARB's website, the "OBD system monitors virtually every component that can affect the emission performance of the vehicle to ensure that the vehicle remains as clean as possible over its entire life. If a problem with an emissions-related component is detected, the OBD system illuminates a warning lamp on the vehicle instrumental panel to alert the driver. The system will also store important information about the detected malfunction so that a repair technician can accurately find and fix the problem." Emphasis added.

52. Further, CARB's On-Board Diagnostic II (OBDII) Systems Fact Sheet (on the CARB website) states that "California's emission warranty requires the vehicle manufacturer to repair under warranty any problem that the OBD II system detects if the vehicle is less than 3 years old and has less than 50,000 miles. Manufacturers only authorize their dealers to perform warranty work. Further, components which exceed a defined cost limit at the time the vehicle

was produced are covered for 7 years or 70,000 miles - this list of covered parts, which varies from car to car, should be listed in the owner's manual or accompanying warranty booklet that came with the vehicle. Additionally, if you have purchased a vehicle that is certified by CARB as a partial zero emission vehicle (PZEV), any problem detected by the OBD II system is covered under warranty as long as the vehicle is less than 15 years old and has less than 150,000 miles."

53. The system uses sensors to gather data which is evaluated using OBDII fault code logic. If the OBDII fault code logic determines that the data is outside of an acceptable range, a fault code is triggered, identifying a defect which increases regulated emissions. If a failure of a component or system would cause an increase of vehicle emissions above the OBDII limits, the MIL has to illuminate. When Defendant seeks certification of vehicles for distribution in California, Defendant is required, pursuant to Section 1968.2, to provide CARB with all of Defendant's OBDII fault codes and the corresponding logic. The fault codes for Defendant's vehicles are identified in a document entitled "OBD2 Summary Tables." Defendant submitted OBD2 Summary Tables or similar documents to CARB for every Class Vehicle and for every model year that the vehicles were certified for sale in California.

54. The "OBD2 Summary Tables" identify the Components/Systems monitored by OBDII, the acceptable ranges relating to the data gathered, the corresponding emissions fault codes and that the MIL will be triggered when a defect is identified. The purpose of the OBDII system, as confirmed in the CCR, is specifically to monitor emissions-related components. This is why Defendant is required to develop a compliant OBDII system which identifies emissions related defects, triggering a fault code and a MIL. The fault codes are used to assist technicians in repairing vehicles, whereas the MIL is used to alert the driver of a defect. Defendant is required to cover under the California Emissions Warranty any defect that triggers a fault code identified by Defendant in its OBD2 Summaries submitted to CARB or that should properly be identified on the OBD2 Summaries because such a defect affects regulated emissions.

55. This means that every defect that triggers the emissions fault codes identified by Defendant in the "OBD2 Summary Tables" and the MIL is, by definition, an emissions-related

defect. The MIL illuminates to notify the driver of detected malfunctions in the vehicle's onboard diagnostic emissions systems. In layman's terms, this means that when the MIL is illuminated, an emissions-related defect has been detected in the vehicle.

56. Defendant knows which fault codes trigger illumination of the MIL because Defendant is responsible for making sure that the vehicles it distributes in California have CARB compliant OBDII systems, and Defendant is required to provide to CARB all the fault codes that trigger a MIL and the specific emissions-related conditions that trigger the fault codes as set forth in the OBD2 Summaries. Further, as confirmed in the CARB Declaration, Defendant is required to identify to CARB all components that "can" or are required to illuminate the MIL in the event of a malfunction, even if the primary function of the component is not emissions control.

57. A fault code and illumination of the MIL indicates that the OBDII system has detected a fault but does not necessarily identify the specific part that needs to be repaired or replaced. Further diagnostics are required. Manufacturers, such as Defendant, have detailed diagnostic and logic charts to trace the fault code to a specific component.

**The Role of CARB**

58. Plaintiff's claim does not depend on the premise that CARB was deceived by the information that Defendant submitted, or that CARB ever expressed a concern about Defendant's classification of components as being covered by the California Emissions Warranty. Plaintiff is not accusing CARB of mismanagement or blaming CARB for Defendant's inaccuracy. Defendant alone is responsible for selecting and identifying to CARB the parts that Defendant has unilaterally identified as being covered by the California Emissions Warranty, as part of its application for vehicle certification. The list of parts Defendant submitted to CARB was incomplete.

59. Moreover, Plaintiff and members of the public are not required to determine prior to presentment for repair or replacement that any particular part should, in fact, properly be covered under the California Emissions Warranty, nor could they even make such a determination by reasonable diligence. It is impractical, and well beyond reasonable diligence,

to require members of the public to examine Defendant's application certification submitted to seeking a repair in order to ferret out whether a particular part for a particular vehicle should have been covered under the California Emissions Warranty.

60. By asserting the claims herein, Plaintiff is not asking for judicial assumption of the role of CARB. To the contrary, Plaintiff is seeking for the Court to perform an ordinary judicial function, namely, to grant relief under the UCL for business practices made unlawful by statute and to determine, by using the Court's basic factfinding and statutory interpretation litigation tools, whether—as to the Subject Parts—Defendant is complying with the California Emissions Warranty law or flouting it systematically.

61. Further, to the extent that there is any doubt as to whether this Court would be assuming, interfering with, or usurping the functions of CARB, the CARB Declaration makes CARB's intentions clear. The CARB Declaration states that the Declaration is provided "for the sole purpose of educating the Courts about CARB's interpretation and implementation of California's warranty requirements." The CARB Declaration confirms that CARB does not consider this matter exclusively within its purview and expects the Court to adjudicate these issues.

## PLAINTIFF'S FACTS

62. On October 25, 2018, Plaintiff purchased a used 2015 Mercedes C300, VIN 55SWF4JBXFU060151 (the "Vehicle"), from Bakersfield Acura (the "Bakersfield Dealership") located in Kern County, California. The Bakersfield Dealership is a vehicle dealership authorized to sell new and used vehicles in the State of California.

63. At the time that Plaintiff purchased the Vehicle, the Vehicle still had in place the remainder of the factory warranty, the remainder of the federal emissions warranty, and the remainder of the California Emissions Warranty. Plaintiff received a warranty book. The warranty booklet provided to Plaintiff indicated that the Vehicle's warranty included coverage pursuant to the California Emissions Warranty.

64. On June 10, 2019, at 58,502 miles, the Vehicle underwent repairs at Alfano Motorcars ("Alfano"), an authorized MBUSA repair facility, where consumers can present their

vehicles for repair pursuant to the MBUSA warranty. Plaintiff visited Alfano because Plaintiff was reporting that the Vehicle became very hot and almost overheated. Alfano generated Invoice 446775 relating to this repair visit.

65. Alfano ran a short test, and found fault code P021700 present, indicating that the coolant temperature was too high. This is a fault code stored in the Vehicle's diagnostic system. Alfano diagnosed the Vehicle as having a faulty coolant thermostat. Alfano subsequently notified Plaintiff that there was no warranty coverage provided by MBUSA at that time relating to the coolant thermostat, and that Plaintiff had to pay out of pocket for the repairs. The Vehicle at that time was below the 7-year and 70,000-mile mark.

66. The total cost of the repairs on June 14, 2019 was $1,040.85. Plaintiff had an aftermarket service contract that paid for $992.85 of the repairs. Plaintiff paid $148.00 out of pocket for the remaining portion of the cost of the repairs.

**ALLEGATIONS REGARDING EQUITABLE RELIEF SOUGHT AS TO THE SUBJECT PARTS**

67. Plaintiff's goal on behalf of the Class with respect to the Subject Parts is to obtain relief requiring MBUSA to comply with the California Emissions Warranty and declaratory relief with respect to the proper interpretation of the California Emissions Warranty and MBUSA's obligations pursuant to the CCRs and the California Emissions Warranty.

68. Equitable relief is necessary and appropriate because the harm suffered by Plaintiff and members of the Class and perpetrated by Defendant with respect to the Subject Parts is not adequately compensable with damages, and damages are not fully adequate to make Plaintiff and the Class whole.

69. Damages are inadequate to compensate for the harms caused by Defendant's continuing failure to cover the Subject Parts under the Emissions Warranty. As alleged above in detail, a purpose of the Emissions Warranty is to protect the environment. A fundamental purpose of the emissions requirements is to reduce emissions, limit fuel consumption and increase fuel efficiency, by forcing manufacturers to repair and/or replace failed emissions-

related Subject Parts under warranty. Money damages will not stop the environmental harm experienced as a result of Defendant's violation of emissions laws.

70. Accordingly, this case is fundamentally different from other UCL cases involving defective products or false advertising because money damages will not fix the environmental harm caused by Defendant's violation of emissions laws, which requires equitable relief.

71. Further, future equitable relief is warranted because Defendant and other car manufacturers should not be able to shirk their legal responsibilities simply by paying damages. Simply paying off consumers undermines the entire purpose of the California Emissions Warranty and will leave Defendant in the position of being able to continue to violate the law and increase harmful vehicle emissions by just paying damages.

72. Further, the prospect of paying damages is insufficient to prevent Defendant from engaging, and continuing to engage, in the alleged unlawful conduct. Money damages are an inadequate remedy for future harm, as they will not prevent Defendant from continuing the alleged wrong practice.

73. Damages for past conduct is not likely to dissuade Defendant from continuing its unlawful behavior as to the Subject Parts in the future. Money damages will not stop the environmental harm experienced by Plaintiff personally, and the members of the public, including breathing polluted and unhealthy air which subjects them to the health risks identified herein, as a result of Defendant's violation of the emissions laws. This degradation of air quality and environmental harm as a consequence of Defendant's unlawful conduct, which Plaintiff personally, and members of the public suffer from, requires injunctive relief. Indeed, environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. Damages for environmental harm are inadequate to make Plaintiff and the public whole because they are inherently uncertain, incomplete, and difficult or impossible to calculate. The requested relief will ensure that Plaintiff and the public are not harmed by the effects of Defendant's continuing, ongoing

and future failure to repair the Subject Parts. Unless enjoined, the harm to the public from the emissions emitted from Defendant's defective Subject Parts will continue.

74. Defendant's decision to not warrant the Subject Parts when it is required to do so under California Emissions Warranty also causes future environmental harm because purchasers will not repair defective Subject Parts if the repair is not covered under warranty, resulting in continuing and irreparable damage to the environment due to Defendant's failure to cover the part.

75. Moreover, payment of damages does not ensure that Subject Parts will actually be repaired. That result will only be ensured by forcing Defendant to cover the repair of Subject Parts under the California Emissions Warranty as required.

76. Many Class members still own Class Vehicles and in the future will need to repair or replace the Subject Parts in their vehicles while the vehicles are still within the 7-year and 70,000-mile California Emissions Warranty period. At this time, with regard to the Class Vehicles, Defendant is refusing to provide California Emissions Warranty coverage for the Subject Parts.

77. Accordingly, the equitable relief requested would go beyond any damages remedy available to Plaintiff and the Class, and damages would not fully remedy the injury to Plaintiff and the Class.

78. Plaintiff's UCL claim expressly provides for equitable relief in the form of restitution and injunctive relief. Plaintiff's claims are equitable because the remedies under the UCL are limited to restitution and injunctive relief and do not include damages.

79. The equitable injunctive relief that Plaintiff requests is prospective in nature and is the only adequate remedy to prevent the future harm that will be caused by Defendant's continuation of the unfair and unlawful conduct alleged herein.

80. Further, to the extent that the alleged defect in the Subject Parts is design related, the defect will continue to manifest in Class Vehicles. When the Subject Parts fail to work properly as described herein, it increases regulated emissions.

81. As a result of Defendant's continuing failure to properly cover the Subject Parts under the California Emissions Warranty, consumers are continuing to pay for vehicles with a non-complaint California Emissions Warranty. An injunction is necessary to prevent this continuing and future misconduct.

82. Plaintiff would purchase Defendant's products in the future; however, Plaintiff is not able to rely on Defendant's California Emissions Warranty in the future and so Plaintiff will not purchase another of Defendant's vehicles, although Plaintiff would like to. Absent injunctive relief, Plaintiff will not know whether it makes sense to spend money on another Defendant vehicle in the future on account of Defendant's noncompliance with the California Emissions Warranty, and Plaintiff and the Class Members will have to deal with the same sort of warranty coverage issues again.

83. Further, if Plaintiff purchases another Defendant vehicle in the future, she might reasonably, but incorrectly, assume that Defendant complied with all the requirements of the California Emissions Warranty, when it did not. Due to Defendant's continuing conduct, Plaintiff is unable to trust Defendant's California Emissions Warranty claims, is unable to rely on Defendant to properly identify parts that should properly be covered under the California Emissions Warranty and has no way to determine whether Defendants' warranty representations are thorough or complete. Thus, absent injunctive relief, Plaintiff will have no way of knowing now, or in the future, whether Defendant, in fact, is complying with the California Emissions Warranty as required. To the extent that Plaintiff does not purchase another of Defendant's vehicles, it will be because, at least in part, Plaintiff is unable to rely on Defendant to comply with the requirements of the California Emissions Warranty.

84. Plaintiff also is entitled to restitution as an equitable remedy to recover out of pocket costs. Restitution is the remedy expressly provided by the UCL for recovering out of pocket costs.

85. Restitution is ancillary to Plaintiff's primary goal of obtaining declaratory relief and/or requiring Defendant to properly and fully comply with the California Emissions Warranty and the UCL, as described herein Plaintiff would bring this action to obtain the

injunctive and declaratory relief sought. Any monetary relief that would flow to the members of the Class would be ancillary to the injunctive or declaratory relief obtained.

86. Restitution and damages are two distinct remedies that serve different purposes. The purpose of restitution is to restore Plaintiff and the Class to their pre-harm position by requiring Defendant to return money (in this case, out of pocket costs) that was taken as a result of Defendant's actions. The purpose of damages, on the other hand, which is not sought here, is to compensate for the harm suffered. The recovery of out-of-pocket expenses is restitution, not damages.

87. Stated differently, restitution and damages are two separate legal concepts designed to address different forms of harm. Damages are a form of compensation awarded to a party who has suffered a loss or injury due to the wrongful actions of another party. The purpose of damages is to place the injured party, as much as possible, back to the position she would have been in if the harm had not occurred. Damages can be compensatory (intended to compensate the injured party for loss or injury) or punitive (intended to punish the wrongdoer). Restitution, on the other hand, is a remedy used to restore the injured party to the position she was in before the wrongful act occurred, by making the wrongdoer disgorge benefits received as a result of its wrongs. The purpose of restitution is not to compensate the injured party for a loss, but rather to prevent the wrongdoer from profiting from its wrongful act. Since the remedy of restitution compensates for a different harm, the legal remedy of damages is inadequate.

88. To the extent further required, Plaintiff further alleges that the purpose of restitution is to restore Plaintiff and the Class to their pre-harm position by requiring Defendant to return money (in this case, out of pocket costs) that was taken as a result of Defendant's actions. The purpose of damages, on the other hand, is to compensate for the harm suffered.

89. Further, restitution would be more certain, prompt or efficient than any legal remedy because there is an inherent limitation of the legal remedy for monetary damages in this case. Under the UCL, Plaintiff may state a claim merely by showing that Defendant's practice violated the unfair or unlawful prongs of the UCL, as Plaintiff alleges here, without having to plead or prove any elements of fraud. A claim for damages under a consumer claim (for

example, under the CLRA), would require Plaintiff to prove reliance, knowledge and/or intent -- elements that Plaintiff is not required to show to establish a claim under the unlawful or unfair prongs of the UCL. Plaintiff does not assert a claim for fraud. However, to prevail in this case under the UCL, Plaintiff need only show that Defendant's conduct is unlawful or unfair. Accordingly, there is a lack of an alternative remedy at law because the elements of Plaintiff's legal claims require proof of conduct beyond that which must be shown to establish liability under the UCL, and Plaintiff lacks an adequate remedy at law that is as "equally prompt and certain" as Plaintiff's equitable claims.

90. Restitution also is more prompt than other legal remedies in this case because it would not require extensive legal proceedings or expert testimony. The Court could order restitution based on simple evidence of what was taken, which can result in a faster resolution of the case.

91. Indeed, restitution under the UCL is more prompt and more efficient because it can be awarded through a bench trial, which is more efficient than a jury trial. There are several efficiencies of a bench trial over a jury trial, including that the court may allow more flexibility on the start and end times each day with minimal breaks, whereas a jury trial requires lengthy breaks and a more structured daily schedule; at a bench trial, the court may permit the parties to dispense with verbal opening and closing statements entirely, and to instead provide the court with written submissions; and the parties may argue evidentiary disputes and other trial-related motions on the record in open court, rather than requiring the court and counsel to hold sidebars on issues that must be argued out of the jury's earshot. Onerous and time-consuming jury related tasks are also avoided, such as drafting *voir dire* questions, *voir dire* motion practice, and conducting the jury selection process itself, and the court can reserve evidentiary and legal issues for its final decision and avoid slowing down the trial, instead of having to decide issues in real time to submit the case to the jury. A significant procedural difference between a bench trial and a jury trial is that a court may elect to reserve a decision when evidentiary challenges occur in a bench trial, rather than rule on them when they arise, as is typical in a jury trial. Reserving judgment on evidentiary objections helps the trial proceed more efficiently and

affords the court time for a more careful review of the proposed evidence before issuing a final decision. Many judges also dispense with opening statements in bench trials because of the extensive pretrial submissions that they often require, which further creates efficiencies over jury trials.

92. Further, in UCL cases, restitution seeks to restore money (i.e., out of pocket costs) that was wrongfully obtained by Defendant. This amount can be calculated with relative certainty, making the amount of restitution more predictable than other types of relief, such as damages. The process of seeking damages also creates complications that make that remedy inadequate compared to straightforward restitution. Whereas the court could order restitution based on simple, easily quantified evidence of what was taken or lost, which results in faster and more efficient resolution of the case, damages calculations can be more speculative, requiring extensive expert testimony and often additional legal proceedings.

93. In addition, restitution is more efficient than other types of relief because it does not require ongoing Court supervision or enforcement. Once an order for restitution has been issued, Defendant is generally required to pay promptly or face additional legal consequences. This can make the process more efficient than other types of relief, such as an award of damages that may require ongoing monitoring and enforcement.

**Public Injunctive Relief**

94. Plaintiff specifically seeks public injunctive relief in her individual capacity, for the benefit of the general public with respect to the Subject Parts. Specifically, Plaintiff seeks injunctive and/or declaratory relief provided by the UCL, as alleged herein, compelling Defendant to, *inter alia*, comply with the CCRs and with the California Emissions Warranty; declare that Defendant's ongoing and past practices as to the Subject Parts do not comply with the CCRs and with the California Emissions Warranty; compel Defendant to identify the correct warranty period for the Subject Parts in the Class Vehicles; and compel Defendant to provide warranty coverage for the Subject Parts pursuant to the California Emissions Warranty.

95. As Plaintiff has suffered injury in fact and lost money or property (due to the out of pocket costs she paid for repairs) as alleged above, Plaintiff has standing to seek injunctive

relief for a threatened future conduct that is injurious to the general public, even if the future conduct will not be injurious to Plaintiff. Further, and to the extent required, Plaintiff alleges that her claim for equitable relief is necessary and appropriate because the harm suffered is not adequately compensable with damages, and damages are not fully adequate to make the injured persons whole.

96. The injunctive relief sought under the UCL has the primary purpose and effect of prohibiting unlawful acts that threaten future injury to the general public. Indeed, Plaintiff seeks to enjoin future violations of California's consumer protection statute, which by its very nature is relief oriented to, and for the benefit of, the general public. An injunction under the UCL is for the benefit of the general public and is designed to prevent further harm to the public at large. An injunction under the UCL is for the benefit of the general public and is designed to prevent further harm to the public at large.

97. As alleged above, the entire purpose of the California Emissions Warranty is to protect the environment and the general public. The fundamental purpose of the emissions requirements is to reduce emissions, limit fuel consumption and increase fuel efficiency, by forcing manufacturers to repair and/or replace failed emissions-related vehicle components under warranty, thereby decreasing emissions affecting the general public. The California Legislature, through the enactment of the California Emissions Warranty, has clearly indicated that the goal of limiting regulated emissions is for the benefit of the public in general and not just purchasers of specific automobiles.

98. The public harm alleged is not conjectural or hypothetical. The harm described herein is precisely why the Regulations relating to the California Emissions Warranty were enacted and is the type of direct harm that the California Emissions Warranty seeks to prevent. Defendant's decision to not warrant the Subject Parts when it is required to do so under the California Emissions Warranty also causes future environmental harm because purchasers will not repair defective Subject Parts if the repair is not covered under warranty, resulting in continuing and irreparable damage to the environment due to Defendant's failure to cover the Subject Parts.

99. Defendant's misconduct is continuing, and Plaintiff's requested relief has the primary purpose and effect of protecting the public from Defendant's ongoing harm. All members of the public can become customers of Defendant at some time in the future, and even if they do not, this does not negate the fact that public injunctive relief will nevertheless offer benefits to the general public.

100. In addition, the issues and claims alleged herein are matters of significant public interest and are likely to recur without injunctive relief. The proper interpretation of a statute (in this case, a California Regulation), including adjudicating whether Defendant's conduct violates the UCL, unquestionably presents a matter of public interest, as Defendant is continuing to misinterpret the California Emissions Warranty as to the Subject Parts, including Sections 2035 and 2037.

101. Further, as alleged above, Plaintiff's request for public injunctive relief seeks to remedy a systemic misconduct namely, Defendant's systemic failure to cover the Subject Parts under the Emissions Warranty. There is a sufficient likelihood that members of the public will again be wronged in a similar way.

102. The public injunctive relief that Plaintiff requests is prospective in nature and is the only adequate remedy to prevent the future harm that will be caused by Defendant's continuation of the unfair and unlawful conduct alleged herein with respect to the Subject Parts. Accordingly, public injunctive relief is necessary and appropriate.

**THE COOLANT THERMOSTAT IS A HIGH-PRICED WARRANTED PART**

103. The coolant thermostat installed in the Class Vehicles regulates the flow of coolant throughout the engine cooling system.

104. MBUSA's warranty books for the Class Vehicles acknowledge that the coolant thermostat is an emissions-related part, and the warranty books for Mercedes vehicles, including MY 2017 through MY 2018 C300 vehicles, identify the coolant thermostat as being a high-priced emissions warranted part covered for 7 years or 70,000 miles.

105. CCR section 2037(c)(1)(B) regarding "High-priced Warranty Parts" requires MBUSA to identify the "high-priced warranted parts . . . which have an individual replacement cost at the time of certification exceeding the cost limit defined in section (c)(3)."

106. As explained below, the cost associated with diagnosing and replacing a defective coolant thermostat for the Class Vehicles exceeds the high-priced emissions warranted parts threshold. Thus, the coolant thermostat should have been classified for all model years of Class Vehicles, including model years 2015 and 2016, as a high-priced warranted part entitled to extended warranty coverage for 7-years/70,000-miles under the California High-Cost Emissions-Related Parts Warranty.

107. As an exemplar, the following analysis identifies the applicable cost limit for the coolant thermostat in MY 2015 and 2016 C300 Class Vehicles and the estimated replacement cost for the coolant thermostats installed in these Vehicles.

108. CARB publishes Manufacturer's Advisory Correspondence (MAC) every year, advising manufacturers of the cost threshold for the upcoming model year vehicles. The cost threshold is supposed to be used by manufacturers in determining if an emissions related part is a high-priced emissions warranty part. The analysis is supposed to be performed prior to distributing the vehicles. If the manufacturer determines that the total cost to the customer of diagnosing the defective emissions related part, paying for the labor to replace the part, and paying for the replacement part exceeds the threshold, then the part must be deemed a high-priced emissions warranty part. If it is deemed a high-priced emissions warranty part, the manufacturer shall provide a 7-year and 70,000-mile warranty for the part.

109. On July 9, 2014, CARB published the MAC for model year 2015 vehicles, including the Class Vehicles. The MAC indicated that the threshold for the cost to diagnose and replace emissions related parts was $590.00.

110. On March 26, 2015, CARB published the MAC for model year 2016 vehicles, including the Class Vehicles. The MAC indicated that the threshold for the cost to diagnose and replace emissions related parts was $600.00.

111. Thus, if the cost to diagnose and repair the coolant thermostats installed in the Class Vehicles exceeded $590 for MY 2015 or $600 for MY 2016, the part should have been identified as a high-priced emissions warranty part covered for 7-years or 70,000-miles.

112. There is no legitimate reason why the coolant thermostats installed in the Class Vehicles were not identified as high-priced emissions warranty parts and did not receive a 7-year and 70,000-mile warranty when the same identical part, with the same functionality, the same repair procedures and protocols, and the same costs of repair was properly identified as a high-priced emissions warranty part for MY 2016-2018 vehicles.

113. The coolant thermostat is the same part number in MY 2015-2018 C Class vehicles, the engine serviced by the coolant thermostat is the same in MY 2015-2018 C Class vehicles, and the functionality of the coolant thermostat in all of the Class Vehicles did not change from MY 2015 through MY2018.

114. Further, the reason that MBUSA determined that the part was a high-priced warranty part in 2017-2018, but not in 2015-2016, is not due to an increase in the cost of the repair for MY 2017-2018. The cost of repair for the coolant thermostat did not change significantly from MY 2015-2018. This is because the repair protocol relating to the coolant thermostat has not changed from Model Year 2015 through 2018 and therefore the time needed to perform the repair also has not changed. Thus, (1) the labor cost to diagnose and repair the part did not significantly change; (2) The cost of the part did not significantly change; and, (3) The consumer price index has grown very little from 2015 to 2020. The growth in the consumer price index has been so slow that there is only a $50.00 increase in the high-priced cost threshold from 2015 to 2020 and the amount that Plaintiff was charged at a MBUSA factory authorized repair facility in 2019 to replace the coolant thermostat was $1,040.85, which is $450.85 above the high-priced threshold. This is far greater than the $50.00 increase in the consumer price index. Furthermore, the function of the coolant thermostat did not change from 2015 through 2018. Thus, there is no legitimate explanation as to why the coolant thermostat would not be included as a high-priced emissions part in 2015-2016 but included as a high-priced emissions part in 2017-2018 based upon the price of the part or the functionality of the

part. Rather, MBUSA wrongfully failed to include the thermostat as a high-priced emissions part for the 2017-2018 Mercedes C300 vehicles.

115. The retail cost of the repairs, even when taking into consideration the escalation in cost over time, clearly exceeds the high-priced emissions parts threshold. There is no legitimate reason for this increase.

116. In addition to the foregoing, evidence adduced to date confirms that the coolant thermostat in the Class Vehicles is a high-priced emissions part, regardless of the information in the CARB Declaration.

117. MBUSA's response to Plaintiff's Special Interrogatory, Set No. 1, No. 6 indicates that for Model Year 2015 C300 vehicles, the cost to replace the thermostat is $555.32. The cost is broken down as $179.00 for the cost of the thermostat, and 2.1 hours to replace the thermostat, at $179.20 per hour. The Operations Items List provided by MBUSA (Bates MBUSA_00003656) allocates the total 2.1 labor hours as follows: 1.5 hours of the time is attributable to removing and installing the coolant thermostat (Bates MBUSA 00003662-MBUSA 00003664, Operations Item AR20.10-P-2460MRA), and .6 hours is attributable to drain/fill correct coolant (not provided by MBUSA in discovery, but Operations Item AR20.00-P-1142LW), for a total of 2.1 hours.

118. The critical deficiency with MBUSA's labor hours calculation is that MBUSA has understated the correct labor time to replace the coolant thermostat because MBUSA used the warranty rate, not the customer pay rate, as described above. The customer pay rate to remove and replace the thermostat, as confirmed by Alldata, indicates a labor charge of 3.0 hours standard time and 2.2 hours OEM warranty time, not 2.1 hours OEM time, as provided by MBUSA. Alldata gets the warranty rate number from documentation provided by MBUSA to Alldata (MBUSA document confirming 2.2 hours warranty time). This discrepancy alone is sufficient to make the thermostat a high-priced warranty part. The reason for this is that 3 hours x $179.20 per hour (as stated in MBUSA's response to Plaintiff's Special Interrogatory, Set No. 1, No. 6) equals $537.60, plus $179.00 for the price of the thermostat (as stated in MBUSA's response to Plaintiff's Special Interrogatory, Set No. 1, No. 6), which totals $716.60, which

exceeds the high-priced threshold of $590.00 for Model Year 2015. For Model Year 2016, 3 hours x $184.00 per hour (as stated in MBUSA's response to Plaintiff's Special Interrogatory, Set No. 1, No. 7) equals $552.00, plus $179.00 for the price of the thermostat (as stated in MBUSA's response to Plaintiff's Special Interrogatory, Set No. 1, No. 7), which totals $731.00, which exceeds the high-priced threshold of $600.00 for Model Year 2016.

119. Even using the warranty pay rate, MBUSA's calculation is wrong because MBUSA fails to take into account the time to diagnose the defect and the failure to include the cost of coolant used for the repair.

120. When including the warranty pay rate of .3 for diagnosis, the total of 2.4 hours causes the cost of the repair to exceed the $590.00 threshold for Model Year 2015, and when adding in the cost of coolant, the amount exceeds the $600.00 threshold for Model Year 2016. Using the customer pay rate causes the numbers to be even greater.

121. Therefore, pursuant to California law, MBUSA is required to provide 7-year and 70,000-mile warranty coverage for the coolant thermostat installed in Class Vehicles. MBUSA currently unlawfully fails to provide this coverage for certain model years of the Class Vehicles. The reason that the coolant thermostats installed in those Class Vehicles did not receive 7-year and 70,000-mile warranty coverage, and as to why the Class Vehicles' MBUSA warranty books did not state that the coolant thermostats were entitled to 7-year and 70,000-mile warranty coverage for those vehicles, is because MBUSA engaged in wrongful conduct by failing to properly identify the coolant thermostats installed in those vehicles as high-priced emissions warranty parts.

122. The warranty booklets relating to certain model years of Class Vehicles should have also identified the coolant thermostat as being a high-priced emissions warranty part. This is because, at the time of initial distribution, the costs associated with diagnosing the parts as being defective, purchasing the parts, and installing the parts, qualified the parts as high-priced emissions parts, as described in the statute.

123. On information and belief, MBUSA's failure to include the coolant thermostat and the other Subject Parts installed in the Class Vehicles as high-priced emissions warranty

parts was an intentional omission by MBUSA, designed by MBUSA in an effort to reduce the money that MBUSA pays out in warranty claims. On information and belief, the coolant thermostat and the other Subject Parts are examples of MBUSA's scheme to fail to properly and comprehensively identify all of the parts that should be identified as high-priced warranted parts and covered for 7 years and 70,000 miles under the California Emissions Warranty.

124. Plaintiff has provided an analysis of why the coolant thermostat should have been designated by MBUSA as a high-priced emissions warranted part in all Class Vehicles. The details of how MBUSA applied the CCR formula with respect to the coolant thermostat and the other Subject Parts are exclusively within, or should be within, MBUSA's possession, since MBUSA applied for certification of the Class Vehicles distributed by MBUSA. Similarly, the information regarding what other parts satisfied the CCR requirements but were not identified by MBUSA as high-priced emissions warranty parts is also exclusively within or should be within the possession of MBUSA.

125. When Class Vehicles are presented to MBUSA dealerships for repairs which should be covered under the 7-year and 70,000-mile California Emissions Warranty but are not identified by MBUSA's Warranty Information booklet as being covered, MBUSA refuses to provide 7-year and 70,000-mile California Emissions Warranty coverage. Plaintiff presented her Vehicle to MBUSA authorized repair facilities for repairs to the coolant thermostat. These repairs should have been covered under the 7-year and 70,000-mile California Emissions Warranty. Plaintiff was wrongfully denied warranty coverage for these repairs, all of which should have been covered under the 7-year and 70,000-mile California Emissions Warranty.

126. The reason that Plaintiff was charged for said repairs was not the result of anything Plaintiff had done, an individual issue relating to the dealership, or an oversight by the dealership in failing to identify the repairs as repairs that should have been covered under the 7-year and 70,000-mile California Emissions Warranty. Rather, Plaintiff was charged for said repairs because of MBUSA's uniform and systematic business practice of intentionally refusing to identify in the MBUSA warranty booklet, and in resources provided to its dealerships, the

Subject Parts that should be identified as high-priced emissions warranty parts under California law in order to limit the amount of warranty claims paid by MBUSA.

127. MBUSA failed to identify said components in order to reduce the amount of money that MBUSA spends on warranty related repairs. If MBUSA complied with California law and properly identified the Subject Parts as high-priced emissions warranty parts that should be identified as such, then MBUSA dealerships would properly provide warranty coverage for said high-priced emissions warranty parts.

128. Furthermore, MBUSA cannot use the explanation that Plaintiff was overcharged by a rogue repair facility. There is no evidence that the repair facilities engaged in price gouging. Quite the opposite is true. A third-party service contract provider paid for a portion of these repairs. The service contract provider is in the business of paying for vehicle repairs and would not pay charges that were inflated or unnecessary.

129. The retail cost of the repairs, even when taking into consideration the escalation in cost over time, clearly exceeds the high-priced emissions parts threshold.

130. The MAC for 2020 vehicles, which was published on March 18, 2019, further illuminates MBUSA's wrongful conduct. The MAC for 2020 states that the high-priced emissions parts threshold is $640.00, which is hundreds of dollars less than what Plaintiff and Plaintiff's third-party service contract paid for the repairs to the Vehicle. Thus, an analysis of the repairs to the coolant thermostat would determine that the price of each of the repairs exceeds the high-priced cost threshold.

131. Similarly, MBUSA cannot credibly argue that it incorrectly estimated the replacement costs of the Subject Parts as an explanation for why MBUSA wrongfully failed to conclude that these were high-priced emissions warranty parts. On information and belief, the actual consumer cost to repair the Subject Parts in the Class Vehicles is hundreds of dollars above the threshold. And the parts are clearly emissions related parts.

132. For the same reasons and based on the same type of analysis, each of the Subject Parts should have been identified as a high-priced emissions warranty part.

133. MBUSA's conduct violates California's unfair business practices statute, California Business and Professions Code section 17200, *et seq*. (the "UCL"), and violates the Consumers Legal Remedies Act, Civil Code section 1750, *et seq.* (the "CLRA").

134. Plaintiff and other members of the Class have suffered injury as a result of MBUSA's wrongful conduct.

135. On September 10, 2019, pursuant to California Civil Code Section 1782, counsel for Plaintiff sent MBUSA a letter, notifying MBUSA in writing of Plaintiff's claims under the Consumers Legal Remedies Act relating to said MBUSA warranty concealment. Said letter provided MBUSA with an opportunity to take actions to remedy said unlawful practices. Specifically, the letter indicated that MBUSA wrongfully failed to identify the vacuum pump, coolant pump, and coolant thermostat relating to the Vehicle as being high-priced emissions parts, having a 7-year, 70,000-mile California Emissions Warranty, and failed to provide said coverage.

136. On November 12, 2019, MBUSA's counsel sent a letter in response, indicating in essence that MBUSA had done nothing wrong, and refusing to take any corrective action.

137. By failing to provide a 7-year, 70,000-mile warranty for the Subject Parts, MBUSA violated the UCL and CLRA.

**THE SUBJECT PARTS**

138. The Subject Parts are: the (1) Manifold PCV Connection Assembly; (2) Power Train Control Unit (PCM); (3) Accelerator Pedal Sensor; (4) Accelerator Pedal; (5) Partial Load Operation Crankcase Ventilation Valve; (6) Clean Air Line; (7) Pressure Sensor Downstream of Air Filter; (8) Check Valve within the EVAP System; (9) Crankcase Ventilation System; (10) Vent Control Valve; (11) Charcoal Canister; (12) Fuel Tank Level Indicator Fill Level Sensors; (13) Coolant Thermostat; and, (14) ESP Electronic Stability Program Control Unit.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

139. Plaintiff brings this class action pursuant to Federal Rules of Civil Procedure Rules 23(a), (b)(2), (b)(3) and (c)(4) on behalf of herself and members of the Class as defined below.

140. Plaintiff's proposed Class consists of and is defined as follows:

> All persons, including in all Reg. 177 States, who purchased or leased any Mercedes Benz vehicle between model year 2015 to the present covered by the 7-year/70,000-mile warranties covering high-priced, emissions-related parts ("HPP Warranties").

141. Excluded from the Class are (a) Defendant, and its subsidiaries and affiliates, its current and former officers, directors, and employees (and members of their immediate families) and the legal representatives, heirs, successors or assigns of any of the foregoing; (b) any governmental entity; (c) any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

142. The Class, as defined herein, does not apply to entirely electric vehicles, as these vehicles are not subject to HPP coverage, and does not cover vehicles which have been certified as Partial Zero Emissions Vehicles, Transition Zero Emissions Vehicles or Super Ultra Low Emissions Vehicles, for which HPP warranties are not applicable.

143. "Reg. 177 States" are States that have adopted California's Low-Emission Vehicle (LEV) criteria pollutant and greenhouse gas (GHG) emission regulations and Zero Emission Vehicle (ZEV) regulations under Section 177 of the Clean Air Act, 42 U.S.C. §7507). At various times during the relevant period, the Reg. 177 States included: California, Colorado, Connecticut, Delaware, Maine, Massachusetts, Maryland, New Jersey, New York, Oregon, Pennsylvania, Rhode Island, Vermont and Washington.

144. Defendant's emissions warranty representations arise out of California law that Defendant has chosen to apply outside of California to the vehicles in the States listed. Accordingly, Defendant's conduct was specifically intended to have effects outside of California and was specifically intended to apply to vehicles and members of the Class in those States that Defendant chose to include by the express terms of the California Emissions Warranty.

145. Under these unique circumstances, California has a specific interest in regulating conduct outside of California that specifically invokes California emissions requirements and California emissions regulations and has an interest in preventing illegal practices that involve

breach of California Emissions Warranty law that Defendant has chosen to invoke outside of California in the States covered by the Registered Vehicle Class. As Defendant seeks to apply the California Emission System Warranty to members of the Classes and vehicles in the listed States outside of California, members of the Classes in those States likewise should be included in a claim that seeks to vindicate their rights under that same warranty in California and should have the ability to have their rights under that warranty asserted in California and pursuant to California law.

146. Defendant's own express application of the California Emissions Warranty constitutes a sufficient connection between California and out-of-state potential Class members. Further, Defendant's misconduct, namely, MBUSA's failure to identify all emissions-related warranted parts to CARB, a California regulator, occurred in California, and even out-of-state purchasers were harmed by MBUSA's conduct that occurred in California. MBUSA failed to disclose, in its submissions to CARB, the parts that are properly covered by the California Emissions Warranty.

147. As alleged herein, MBUSA is solely responsible for selecting and identifying to CARB all of the parts that should be classified as emissions warranted parts, and MBUSA failed to include the subject parts and other components. Californians and out-of-state potential Class members in the additional States covered by the California Emissions Warranty suffered an identical harm – they were forced to pay the costs of repair or replacement for parts that should have been covered under the California Emissions Warranty. Under these unique circumstances, California has the greater interest in applying California's consumer laws to enforce compliance with the California Emissions Warranty than the other States have in using their consumer laws to enforce the same Regulation. California has a specific interest in regulating conduct outside of California that specifically invokes California emissions requirements and regulations, and California has an interest in preventing illegal practices that involve breach of California emissions law that Defendant has chosen to invoke outside of California in the specific States covered. California also has a supreme interest in applying its own consumer protection laws in

ensuring that the California Emissions Warranty is properly interpreted and applied wherever MBUSA has chosen to invoke it.

148. Under the facts of this specific case, the law of California should be applied because California's interest would be more impaired if its consumer laws to enforce the California Emissions Warranty were subordinated to consumer laws of the other States to which MBUSA has chosen to apply the requirements of the California Emissions Warranty. Other jurisdictions' interests in applying their own consumer protection laws to their own residents do not strongly outweigh the interest California has in applying its consumer protection laws to enforce the California Emission Warranty with respect to the specific potential out-of-state members of the Classes identified herein. Therefore, the Class alleged herein includes persons who purchased or leased vehicles with transmissions and that are registered in States other than California.

149. In sum, there are multiple clear nexuses between California and the other states: each state at issue chose to use California's Emissions Warranty law at various times through the Class period; MBUSA chose to incorporate California's emissions warranty into its warranty in other states; and MBUSA allegedly made misrepresentations to California's regulator, CARB. There is no credible argument that these other States would choose to apply their own consumer protection law in this situation, given that they have already chosen to piggyback off California's consumer protection law. California and the other States each have an interest in having California's law interpreted correctly: their interests are not in tension, and even if they must be balanced, California's outweighs the other States.

150. There is sufficient similarity among all the Class Vehicles and MBUSA's conduct as defined herein in that, among other things, all of the vehicles in the proposed Class are subject to the same California Emissions Warranty and the same requirements that MBUSA report all emissions-related defects to CARB pursuant to the CCR. MBUSA has acted in a uniform manner with respect to all Class vehicles by failing to properly cover the Subject Parts in the Class Vehicles as required under the California Emissions Warranty and as described herein.

151. On behalf of the Class, Plaintiff seeks relief requiring MBUSA to identify the Subject Parts in Class Vehicles as components that should have been, and that should be, properly covered under the California Emissions Warranty and 100% coverage of future or going forward coverage for the diagnosis, repair or replacement of the Subject Parts, so long as the diagnosis, repair or replacement takes place after the expiration of the vehicle's 4-year/50,000-mile warranty but before the expiration of the vehicle's 7-year/70,000-mile warranty and the repair or replacement is not otherwise excluded from Emissions Warranty coverage for the reasons set forth in the warranty books for the Class Vehicles (e.g., if the vehicle or engine manufacturer demonstrates that the vehicle or engine has been abused, neglected, or improperly maintained, and that such abuse, neglect, or improper maintenance was the direct cause of the need for the repair or replacement of the Subject Parts).

152. On behalf of the Class, Plaintiff also seeks reimbursement of (1) 100% of the out of pocket costs paid by Class members for past diagnosis of the Subject Parts incurred after the expiration of the vehicle's 4-year/50,000-mile warranty but before the expiration of the vehicle's 7-year/70,000-mile warranty, provided that the diagnosis was performed at an authorized MBUSA dealership and otherwise is not excluded from Emissions Warranty coverage as set forth above; and (2) out-of-pocket costs paid by Class members for past repair or replacement of the Subject Parts incurred after the expiration of the vehicle's 4-year/50,000-mile warranty but before the expiration of the vehicle's 7-year/70,000-mile warranty, provided that the repair or replacement was performed at an authorized MBUSA dealership and otherwise is not excluded from Emissions Warranty coverage as set forth above. Further, Plaintiff does not seek double recovery. If a Class the repair member receives goodwill, extended warranty coverage, or other form of coverage for the repair, replacement, or diagnosis, the total amount of coverage will be offset against the amounts given.

153. Plaintiff reserves the right to redefine the Class and to add Classes or Subclasses, as necessary.

154. As required by Fed. R. Civ. P. 23(a)(2) and (b)(3), there are questions of law and fact common to the Class, and those common questions predominate over any questions affecting only individual members. Among the common questions of law and fact include:

(a) Whether MBUSA has failed, and is failing, to comply with the High-Cost Emissions-Related Parts Warranty by failing to provide a 7-year and 70,000-mile California Emissions Warranty for the Subject Parts that should be defined by MBUSA as high-priced warranted parts pursuant to the CCR.

(b) Whether MBUSA has failed, and is failing, to identify for consumers and dealerships the Subject Parts that should be identified as high-priced warranted parts, and thus covered by the 7-year and 70,000-mile California High-Cost Emissions-Related Parts Warranty.

(c) Whether MBUSA has engaged in, and is engaging in, a business practice of failing to identify the Subject Parts that should be identified as high-priced warranted parts and thus covered by the 7-year and 70,000-mile California High-Cost Emissions-Related Parts Warranty under the CCR.

(d) Whether MBUSA has failed, and is failing, to identify Subject Parts that should be identified as high-priced warranted parts and thus covered by the 7-year and 70,000-mile California High-Cost Emissions-Related Parts Warranty in an effort to reduce the amount of money that MBUSA spends on warranty related repairs.

(e) Whether MBUSA's conduct of failing to identify the Subject Parts that should be identified as high-priced warranted parts and thus covered by the 7-year and 70,000-mile California High-Cost Emissions-Related Parts Warranty results in consumers suffering financial loss.

(f) Whether MBUSA's conduct of failing to identify the Subject Parts that should be identified as high-priced warranted parts and thus covered by the 7-year and 70,000-mile California High-Cost Emissions-Related Parts

Warranty results in wrongfully minimizing the amount of money that MBUSA has to pay out in warranty claims.

(g) Whether MBUSA's conduct of failing to identify the Subject Parts that should be identified as high-priced warranted parts and thus covered by the 7-year and 70,000-mile California High-Cost Emissions-Related Parts Warranty violates California law.

(h) Whether MBUSA has engaged in, and is engaging in, unlawful and unfair business practices in violation of California Business & Professions Code section 17200, *et seq.* with regard to MBUSA's failure to identify the Subject Parts as high-priced warranted parts that should be covered by the 7-year and 70,000-mile California High-Cost Emissions-Related Parts Warranty.

(i) Whether Plaintiff and members of the Class are entitled to injunctive relief regarding MBUSA's failure to identify the Subject Parts as high-priced warranted parts as that should be covered by the 7-year and 70,000-mile California High-Cost Emissions-Related Parts Warranty.

(j) Whether MBUSA has used, and continues to use, the wrong standard for determining whether the Subject Parts are "warranted" or "emissions-related;"

(k) Whether and to what extent members of the Class have suffered damage as a result of MBUSA using the wrong standard for determining whether the Subject Parts should be covered under the California Emissions Warranty;

(l) The appropriate amount of restitution, or monetary penalties resulting from MBUSA's violations of California law.

(m) Whether MBUSA has engaged in, and is engaging in, concealment relating to MBUSA's failure to identify the Subject Parts as high-priced

warranted parts that should be covered by the 7-year and 70,000-mile California High-Cost Emissions-Related Parts Warranty.

(n) Whether MBUSA has violated and is violating the Consumers Legal Remedies Act, Civil Code section 1750, *et seq*., with regard to MBUSA's failure to identify the Subject Parts as high-priced warranted parts which should be covered by the 7-year and 70,000-mile California High-Cost Emissions-Related Parts Warranty.

155. Numerosity: As required by Fed. R. Civ. P. 23(a)(1), the members of the Class are so numerous that joinder of all members of the Class would be unfeasible and impractical, and the resolutions of their claims through the procedure of a class action will be of benefit to the Parties and the Court. The exact membership of the Class is unknown to Plaintiff at this time; however, the membership of the Class is estimated to be greater than one hundred (100) individuals and the identity of such membership is readily ascertainable by inspection of Defendant's records.

156. Typicality: As required by Fed. R. Civ. P. 23(a)(3), Plaintiff's claims are typical of the claims of all members of the Class since Plaintiff and all members of the Class suffered out-of-pocket expenses and/or damages as result of Defendant's concealment and wrongful conduct set forth herein.

157. Adequacy: As required by Fed. R. Civ. P. 23(a)(4), Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has no interests adverse or antagonistic to those of the Class and has retained counsel competent and experienced in class action litigation who will zealously prosecute this matter on behalf of the Class to its conclusion

158. Superiority: As required by Fed. R. Civ. P. 23(b)(3), the nature of this action makes the use of class action adjudication superior to other methods. A class action will achieve economies of time, effort, and expense as compared with separate lawsuits, and will avoid inconsistent outcomes because the same issues can be adjudicated in the same manner and at the same time for the entire Class.

159. Defendant keeps extensive computerized records of its customers. Defendant has one or more databases through which a significant majority of members of the Class may be identified and ascertained, and it maintains contact information, including email and home mailing addresses, through which notice of this action could be disseminated in accordance with due process requirements.

160. Class certification of Plaintiff's claims is also appropriate pursuant to Fed. R. Civ. P. 23(b)(2) because Defendant has acted or refused to act on grounds generally applicable to Plaintiff and members of the Class, making appropriate both declaratory and injunctive relief with respect to Plaintiff and members of the Class.

## TOLLING OF THE STATUTE OF LIMITATIONS

161. MBUSA has actively engaged in misleading, and dishonest conduct relating to its failure to properly identify the Subject Parts as high-priced warranted parts covered under the 7-year and 70,000-mile California Emissions Warranty. Despite acting diligently, Plaintiff and members of the Class cannot be reasonably expected on their own to learn or discover that the Subject Parts and repairs should be identified as high-priced and covered under the 7-year and 70,000-mile California Emissions Warranty. Therefore, the discovery rule is applicable to the claims asserted by Plaintiff and members of the Class, and the statute of limitations for bringing the claims set forth herein should be tolled.

162. MBUSA has actual and constructive knowledge that it is violating California law by failing to identify the Subject Parts as high-priced warranted parts, and by failing to provide a 7-year and 70,000-mile California Emissions Warranty relating to said parts. MBUSA has concealed from Plaintiff and members of the Class that MBUSA is violating California law as set forth herein.

163. Any applicable statute of limitation is tolled by MBUSA's knowledge, active concealment, and wrongful conduct set forth herein. MBUSA is further estopped from relying on any statute of limitation because of its concealment set forth herein.

**FIRST CLAIM FOR RELIEF**

**Violation of California Unfair Competition Law**

**(Cal. Bus. & Prof. Code § 17200, *et seq*.)**

164. Plaintiff re-alleges and incorporates by reference each allegation set forth above.

165. California Business and Professions Code section 17200, *et seq*. (the "UCL") prohibits "any unlawful, unfair or fraudulent business act or practice." MBUSA has committed acts of unfair competition proscribed by the UCL, including the acts and practices alleged herein.

166. The UCL imposes strict liability. Plaintiff need not prove that MBUSA intentionally or negligently engaged in unlawful or unfair business practices – only that such practices occurred.

167. MBUSA is a "person" as defined by Business & Professions Code § 17201.

168. As a direct and proximate result of MBUSA's acts and practices in violation of the UCL, Plaintiff and members of the Class have suffered injury in fact and lost money or property as set forth above and will continue to do so.

**Unlawful Prong**

169. A business practice is "unlawful" under the UCL if it is forbidden by law or regulations, including standard of professional conduct. The violation of any law or regulation may serve as the predicate for a violation of the "unlawful" prong of the UCL.

170. MBUSA failed to comply with the California Emissions Warranty requirements pursuant to the CCR by failing to provide 7-year and 70,000-mile warranty coverage for the Subject Parts. The California Emissions Warranty applies to all Class Vehicles. 13 CCR 2037(a). Pursuant thereto, manufacturers shall warrant that vehicles conform with the California Air Resources Board regulations and are free from defects which cause the failure of a warranted part to perform as described in the application for certification, including defects which would cause the vehicle's on-board diagnostic malfunction indicator to illuminate, for 3 years or 50,000 miles. 13 CCR 2037(b)(1)-(2). The vehicle manufacturer is MBUSA, which is the manufacturer granted certification for the Class Vehicles. 13 CCR 2035(c)(5). The parts at

issue are all warranted parts. The warranty period shall be 7- years and 70,000 miles for high-priced emissions parts. 13 CCR 2037(b)(3). High-priced emissions parts are those parts which, when taking into consideration the cost to diagnose, replace and pay for the failed part, exceed the cost limit defined in 13 CCR 2037(c)(3). The California Air Resources Board published memos which calculated the cost limit for the relevant years. The Subject Parts exceeded the cost limit for the correlating years and should have received California Emissions Warranty coverage, MBUSA failed to provide 7-year and 70,000-mile warranty coverage for said parts. The failure has resulted in harm to Plaintiff and members of the Class.

171. MBUSA did not designate the Subject Parts as high-priced warranted parts that should be covered by the 7-year and 70,000-mile California High-Cost Emissions-Related Parts Warranty. Thus, MBUSA's violation of Section 2037(c)(1)(B) directly affected communications with consumers. By violating Section 2037(c)(1)(B), MBUSA was able to avoid disclosing in the warranty books all of the parts that should have been included as high-priced warranted parts.

172. MBUSA's conduct also violates the unlawful prong in that MBUSA has violated the CLRA as further alleged below.

173. MBUSA's acts of unlawful competition as set forth above have caused members of the Class to suffer injury, present a continuing threat and will persist and continue to do so unless and until this Court issues appropriate injunctive relief. Plaintiff also seeks attorneys' fees and costs pursuant to, *inter alia*, C.C.P. Section 1021.5.

**Unfair Prong**

174. MBUSA's conduct violates the unfair prong of the UCL.

175. An act or practice is unfair if the consumer injury is substantial, is not outweighed by any countervailing benefits to consumers or to competition and is not an injury the consumers themselves could reasonably have avoided. An act or practice also is unfair if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. An act or practice also is unfair if Plaintiff's claims are

"tethered" to specific constitutional, statutory or regulatory provisions. MBUSA's conduct violates all of these definitions.

176. As alleged above, MBUSA engages and has engaged in a systematic business practice of failing to identify in the Class Vehicles' warranty books at the time of distribution, and in resources provided to its dealerships, numerous parts that MBUSA is obligated to identify as high-priced warranted parts and emission related parts by operation of law, specifically the Subject Parts, MBUSA does this in an effort to reduce the amount of money that MBUSA spends on warranty-related repairs knowing that it would be very difficult if not impossible for most consumers to discover this unlawful conduct. If MBUSA complied with California law and properly identified the Subject Parts that should be identified as high-priced warranted parts, then MBUSA dealerships would properly provide warranty coverage for said high-priced warranted parts.

177. Further, MBUSA's conduct is unfair because it intentionally refuses to provide warranty coverage for the Subject Parts for the sole purpose of wrongfully limiting its warranty claims, with no regard for the fact that the public is being forced to pay for repairs which should be covered under the 7-year and 70,000-mile California Emissions Warranty. Plaintiff and members of the Class have suffered injury in fact and lost money or property as a result of MBUSA's unfair business acts and practices as set forth in detail.

178. MBUSA's failure to properly identify the Subject Parts where coverage should be provided pursuant to the CCR and/or all parts as high-priced warranted and emissions related parts that should be identified as such, is a uniform, systematic, and intentional business practice on the part of MBUSA to minimize the amount of money that MBUSA has to pay out in warranty claims. This conduct violates California law.

179. As a direct and proximate result of MBUSA's acts and practices in violation of the UCL, Plaintiff and members of the Class have paid out of pocket to repair and/or replace the Subject Parts where coverage should be provided pursuant to the CCR and/or other high-priced warranted parts and emissions related parts that should have been covered by MBUSA under the 7-year and 70,000-mile California Emissions Warranty. As a result, consumers have been forced

to pay out of pocket to repair or replace the Subject Parts that should be covered under warranty is clearly unfair.

180. MBUSA's conduct does not benefit consumers or competition. Plaintiff and members of the Class could not reasonably avoid the injury each of them suffered or will suffer, which injury is substantial. MBUSA's conduct only benefits MBUSA, by MBUSA wrongfully avoiding having to pay warranty claims which should be covered by the California Emissions Warranty.

181. The gravity of the consequences of MBUSA's conduct as described above outweighs the justification, motive or reason therefor, is immoral, unethical and unscrupulous.

182. MBUSA's conduct also offends established public policy that is tethered to legislatively declared policies as set forth in the laws detailed above, including California laws and regulations regarding California's Emission Control System Warranty Requirements, or is substantially injurious to the public, for the reasons set forth above.

183. To the extent that any definition of "unfair" requires a balancing test or weighing various factors, such an inquiry is fact intensive and requires a full factual record as to MBUSA's justification and motives for its conduct, and as to the impact of MBUSA's conduct on Plaintiff and members of the Class.

184. MBUSA's acts of unfair competition as set forth above present a continuing threat and will persist and continue to do so unless and until this Court issues appropriate injunctive relief. Plaintiff also seeks attorneys' fees and costs pursuant to, *inter alia*, C.C.P. § 1021.5.

**<u>Deceptive Prong</u>**

185. Plaintiff's claim under this prong is predicated on omissions, not misrepresentations. While the warranty booklets for Class Vehicles claim to identify all of the parts covered under the 7-year and 70,000-mile California emissions warranty, the warranty books omit the Subject Parts where coverage should be provided pursuant to the CCR under the California Emissions Warranty.

186. MBUSA engages in a uniform and systematic business practice of failing to identify in the MBUSA warranty books, and in resources provided to its dealerships, the Subject Parts installed in the Class Vehicles where coverage should be provided pursuant to the CCR as high-priced warranted parts. MBUSA does this in an effort to intentionally conceal the identity of the parts which should be covered under the 7-year and 70,000-mile California Emissions Warranty for high-priced emissions parts. This has intentionally misled consumers with regard to what parts are covered under the 7-year and 70,000-mile California Emissions Warranty for high-priced parts and reduced the amount of money that MBUSA spends on warranty-related repairs. As warranted parts necessary for the operation of the vehicles, the parts that MBUSA failed to properly identify as high-priced relate to the central functionality of the vehicles and are critical to the vehicles' operation. If MBUSA complied with California law, and properly identified the Subject Parts as high-priced warranted parts, then MBUSA dealerships would properly provide warranty coverage for said high-priced warranted parts.

187. MBUSA's failure to properly identify the Subject Parts where coverage should be provided pursuant to the CCR as high-priced warranted parts is a systematic and intentional business practice on the part of MBUSA to minimize the amount of money that MBUSA has to pay out in warranty claims. This conduct violates California law.

188. Said conduct is likely to deceive an ordinary consumer as MBUSA concealed this information from consumers and from MBUSA's dealerships, in an effort by MBUSA to minimize the amount of money that MBUSA has to pay out in warranty claims. One of the ways MBUSA misleads consumers relates to the information that MBUSA provides to consumers in the MBUSA warranty books. MBUSA omits information from the warranty books by intentionally failing to classify the Subject Parts as parts that should be covered under the 7-year and 70,000-mile California Emissions Warranty.

189. In evaluating the repair costs to be charged, Plaintiff and members of the Class have justifiably relied on the information in the warranty booklets about parts that should be covered under the high-priced emissions warranty and have been deceived and suffered damage as a result of MBUSA's intentional and wrongful conduct.

190. MBUSA is fully aware of its obligations pursuant to the CCR and purports to comply with them. However, in derogation if its legal obligations, MBUSA conceals from consumers, and from the MBUSA dealerships, proper warranty coverage for the Subject Parts, in order to reduce the amount of money that MBUSA has to pay in warranty claims.

191. MBUSA is and was under a duty to disclose to consumers and to its dealerships that the Subject Parts should be covered pursuant to the CCR under the California Emissions Warranty.

192. MBUSA is and was further under a duty to disclose to consumers and to its dealerships the Subject Parts, which it is required to cover under the 7-year and 70,000-mile California Emissions Warranty because:

(1) MBUSA is and was in a superior position to know the true state of facts about the duration of the California Emissions Warranty and which parts should be covered as high-priced warranted parts;

(2) MBUSA has made partial disclosures about the extent of the California Emissions Warranty;

(3) MBUSA has actively concealed and failed to identify the Subject Parts that are covered under the California Emissions Warranty; and,

(4) Members of the Class, including Plaintiff, have suffered actual loss due to MBUSA's conduct.

193. The facts not disclosed by MBUSA to Plaintiff and members of the Class are material. Had Plaintiff and members of the Class known the true extent of the California Emissions Warranty and had MBUSA been truthful to its dealerships and members of the Class with regard to identifying the Subject Parts and repairs that are covered under the California Emissions Warranty, Plaintiff and members of the Class would have been able to avoid spending money in order to repair MBUSA vehicles covered by the California Emissions Warranty. As a result, Plaintiff and members of the Class have suffered injury.

194. In order to minimize the amount of money that MBUSA spends on warranty related repairs, MBUSA continues to conceal that the Subject Parts should be covered under the California Emissions Warranty.

195. Furthermore, MBUSA has refused to, and continues to refuse to provide 7-year and 70,000-mile California Emissions Warranty coverage relating to all repairs for the Subject Parts where coverage should be provided pursuant to the CCR. This refusal is willful, unfair, and unlawful.

**SECOND CLAIM FOR RELIEF**

**Violation of California Consumers Legal Remedies Act**

**(Cal. Civil Code § 1750, *et seq*.)**

196. Plaintiff re-alleges and incorporates by reference each allegation set forth above.

197. MBUSA has violated Section 1770 of the California Consumers Legal Remedies Act, Cal. Civ. Code Section 1750, *et seq*. (the "CLRA"). The violation results from MBUSA's failure to keep its promise to the State of California, and members of the Class, including Plaintiff, that it would honor the terms of the MBUSA warranty, and by doing so, that it would honor the terms of the CCR. Furthermore, the MBUSA warranty book provided by MBUSA to consumers, including Plaintiff, specifically references the California Emissions Warranty, and both inferentially and specifically represents that it will honor the terms of the CCR, however MBUSA has refused, and continues to refuse to honor the terms of the CCR, as stated herein.

198. Plaintiff is a consumer who was wrongfully required to pay for repairs which should have been paid for by MBUSA pursuant to the CCR. The Vehicle was presented by Plaintiff for repairs at MBUSA authorized repair facilities, in compliance with the terms and conditions of the MBUSA warranty. The Vehicle required repairs which should have been covered pursuant to the CCR, based upon the Vehicle's mileage and age. MBUSA wrongfully failed and refused to pay for the warranty repairs due to the unlawful pattern and practice set forth herein. Thus, Plaintiff suffered damage.

199. MBUSA knows that it is violating the terms of the CCR, however MBUSA intentionally violates the CCR in order to save money. Plaintiff and members of the Class are

generally unaware of the terms and scope of the CCR, thus MBUSA is able to get away with said wrongful conduct. As a result, Plaintiff and members of the Class have suffered damage. MBUSA engages in a systemic pattern of denying warranty claims under the CCR relating to the Subject Parts.

200. Plaintiff and members of the Class have presented Class Vehicles to MBUSA authorized repair facilities for repairs that should have been covered under the CCR, but coverage has been wrongfully denied to them. As a result, Plaintiff and members of the Class have thus suffered damage. Plaintiff brings this claim on behalf of Plaintiff and members of the Class.

201. MBUSA's conduct in warranting, advertising, leasing, selling and distributing Class Vehicles in the State of California, while at the same time knowingly and wrongfully failing to honor the terms of the CCR, constitutes the following violations of Section 1770:

(a) MBUSA represents and has represented that Class Vehicles sold and leased in the State of California have characteristics or benefits which they did not have (in violation of Section 1770(a)(5));

(b) MBUSA has falsely represented that Class Vehicles sold and leased in the State of California were of a particular standard, quality, or grade when they were of another (in violation of Section 1770(a)(7)); and,

(c) MBUSA advertised Class Vehicles that have been sold and leased in the State of California with the intent not to sell them as advertised (in violation of Section 1770(a)(9)).

202. Civil Code section 1780(a) provides that any consumer who suffers damage as a result of a violation of the CLRA may bring an action to recover: 1) actual damages, but in no case shall the total award of damages in a class action be less than $1,000; 2) an order enjoining the methods, acts, or practices; 3) restitution of property; 4) punitive damages; and, 5) any other relief that the court deems proper.

203. Civil Code section 1781 provides that Plaintiff may pursue this case as a class action.

204. Plaintiff requests injunctive relief pursuant to Civil Code section 1782(d).

205. Plaintiff is entitled to attorney fees pursuant to Civil Code section 1780(e).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, prays for relief and judgment against MBUSA as follows:

(a) An order certifying the proposed Class, designating Plaintiff as named representative of the Class, and designating the Plaintiff's Counsel as Class Counsel;

(b) An order requiring MBUSA to identify the Subject Parts in Class Vehicles as components that should have been, and that should be, properly covered under the California Emissions Warranty and provide 100% coverage of future or going forward coverage for the diagnosis, repair or replacement of the Subject Parts in Class Vehicles, so long as the diagnosis, repair or replacement takes place after the expiration of the vehicle's 4-year/50,000-mile warranty but before the expiration of the vehicle's 7-year/70,000-mile warranty, and the repair or replacement is not otherwise excluded from Emissions Warranty coverage for the reasons set forth in the warranty books for the Class Vehicles (e.g., if the vehicle or engine manufacturer demonstrates that the vehicle or engine has been abused, neglected, or improperly maintained, and that such abuse, neglect, or improper maintenance was the direct cause of the need for the repair or replacement of the Subject Parts);

(c) Reimbursement of 100% of the out-of-pocket costs paid by Class members for past diagnosis of the Subject Parts in Class Vehicles incurred after the expiration of the vehicle's 4-year/50,000-mile warranty but before the expiration of the vehicle's 7 year/70,000-mile warranty, provided that the diagnosis was performed at an authorized MBUSA dealership, and the repair or replacement is not otherwise excluded from Emissions Warranty coverage for the reasons set forth in the warranty books for the Class Vehicles (e.g., if the vehicle or engine manufacturer demonstrates that the vehicle or engine has been abused, neglected, or improperly maintained, and that such abuse, neglect, or improper maintenance was the direct cause of the need for the repair or replacement of the Subject Parts);

(d) Reimbursement of out-of-pocket costs paid by Class members for past repair or replacement of the Subject Parts in Class Vehicles incurred after the expiration of the vehicle's 4-year/50,000-mile warranty but before the expiration of the vehicle's 7-year/70,000-mile warranty, provided that the repair or replacement was performed at an authorized MBUSA dealership, and the repair or replacement is not otherwise excluded from Emissions Warranty coverage for the reasons set forth in the warranty books for the Class Vehicles (e.g., if the vehicle or engine manufacturer demonstrates that the vehicle or engine has been abused, neglected, or improperly maintained, and that such abuse, neglect, or improper maintenance was the direct cause of the need for the repair or replacement of the Subject Parts);

(e) Notice to the Class of the relief provided;

(f) An award of attorneys' fees and costs, as allowed by law;

(g) An award of attorneys' fees and costs pursuant to California Code of Civil Procedure § 1021.5;

(h) An award of pre-judgment and post-judgment interest;

(i) Leave to amend to conform to the evidence produced at trial or as otherwise necessary; and,

(j) Other relief as may be appropriate under the circumstances.

Dated: November 13, 2025

Respectfully submitted,

**POMERANTZ LLP**
**FRONTIER LAW CENTER**

By: /s/ Ari Y. Basser
Jordan L. Lurie
Ari Y. Basser
Manny Starr

*Attorneys for Plaintiff and the Class*